IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

SWAN VIEW COALITION and        )    CV 05-64-M-DWM
FRIENDS OF THE WILD SWAN,      )
                               )
        Plaintiffs,            )
                               )
        vs.                    )    ORDER
                               )
CATHY BARBOULETOS, FLATHEAD    )
NATIONAL FOREST SUPERVISOR;    )
ABIGAIL KIMBELL, REGION ONE    )
REGIONAL FORESTER; DALE        )
BOSWORTH, U.S. FOREST CHIEF;   )
and GALE NORTON, SECRETARY OF  )
INTERIOR,                      )
                               )
        Defendants,            )
                               )
and                            )
                               )
PYRAMID MOUNTAIN LUMBER, INC., )
F.H. STOLTZE LAND & LUMBER     )
CO., R&R CONNER, INC.,RANDY     )
BIRKY LOGGING, INC. HORIZON     )
HELICOPTERS, JERRY FRACCIA      )
EXCAVATING, and MONTANA WOOD    )
PRODUCTS ASSOCIATION,           )
                               )
        Defendants-Intervenors )
_____)

## I.  Introduction

Plaintiffs Swan View Coalition and Friends of the Wild Swan ("Plaintiffs") bring this action seeking judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, of agency actions by the United States Forest Service and the United States Fish & Wildlife Service concerning the Robert-Wedge and West Side Reservoir Post-Fire Projects in the Flathead National Forest.  Plaintiffs' First Amended Complaint alleges that the agencies acted in violation of the Endangered Species Act (ESA"), 16 U.S.C. § 1533 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.

Pending before the court are cross-motions for summary judgment on all claims and the Plaintiffs' motion to strike.

## II.  Factual Background

### A.    The Flathead National Forest Plan and Amendment 19

The Forest Service adopted the Flathead National Forest Plan on January 22, 1986.  Amendment 19 Decision Notice, FWS AR 03678. The Fish & Wildlife Service's Biological Opinion for the Forest Plan, issued in 1985 and amended in 1989, concluded that implementation of the Plan was not likely to result in jeopardy to the continued existence of threatened or endangered species. 1995 Amendment 19 Biological Opinion, FWS AR 04866-04867.  Among these species is the grizzly bear, listed as threatened under the ESA in 1975.  40 Fed. Reg. 31736.

-2-

Pursuant to the ESA, the Fish & Wildlife Service approved a
Grizzly Bear Recovery Plan in 1982 and revised the Plan in 1993.
FWS AR 04094.  The Recovery Plan establishes five Recovery Zones,
including the Northern Continental Divide Ecosystem zone, which
includes parts of the Flathead National Forest and the Robert-
Wedge and West Side Project Areas.  Id. at 04161; Robert-Wedge
Final Environmental Impact Statement at 1-8; West Side Final
Environmental Impact Statement at 1-4.[1]  Land management
direction is set forth in the Recovery Plan through the
establishment of Management Situations.  FWS AR 04125.  The
Interagency Grizzly Bear Guidelines promulgated in 1986 define
each Management Situation.  51 Fed. Reg. 42863.  Grizzly
population centers are designated as Management Situation 1.  Id.
at 42865.  In those areas, "[m]anagement decisions will favor the
needs of the grizzly bear when grizzly habitat and other land use
values compete."  Id.; see also Grizzly Bear Recovery Plan, FWS

_____

[1]The Northern Continental Divide Ecosystem recovery zone is
divided into bear management units to facilitate habitat evaluation
and population monitoring.  FWS AR 08478.  The Flathead National
Forest contains 11 Bear Management Units, which are further divided
into 70 bear management unit subunits measuring about 50 square miles
each, or the approximate size of an adult female grizzly bear's home
range.  FWS AR 08481; FWS AR 03617.  Amendment 19 applies to 54 of the
bear management subunits; the remaining 16 subunits are not subject to
Amendment 19 either because they are wilderness (13 subunits) or
because they contain too lite Forest land (3 subunits).  Id.  The West
Side Project area lies within the Ball Branch, Doris Lost Johnny,
Jewel Basin Graves, Kah Soldier, Wheeler Quintonkon and Wounded Buck
Clayton subunits.  FWS AR 08489.  The Robert-Wedge Project area lies
within the Canyon McGinnis, Cedar Teakettle, Lower Big Creek,
Ketchikan, Lower Whale Creek, Upper Trail Creek, and Upper Whale
Shorty subunits.  FWS AR 08491.

-3-

AR 04125 ("The needs of the grizzly bear will be given priority over other management considerations.").

The Forest Service added Amendment 9 to the Forest Plan on July 31, 1989, which was a programmatic amendment incorporating into the Plan the Interagency Grizzly Bear Guidelines and amending the Management Situation descriptions and direction to read exactly as published in the Guidelines.  Forest Plan, USFS WS AR S-1 at Amendments, p. 1 and Appendix OO.  The Forest Service has designated 94 percent of the Flathead National Forest land within the Northern Continental Divide Ecosystem recovery zone as Management Situation 1 and an additional 5 percent as Management Situation 2.  FWS AR 03627.  With the exception of the Cedar Teakettle subunit, the bear management subunits at issue in this case are within Management Situation 1 territory.  Forest Plan, USFS  WS AR S-1 at II-37; Amendment 19 Amended Environmental Assessment, USFS WS AR E1-396 at 12-13.  The Cedar Teakettle subunit is within Management Situation 2 territory.  Id.  These designations and the corresponding management direction are binding upon the agency.

Several parties challenged the Forest Plan in a 1989 lawsuit, which culminated in a ruling by the Ninth Circuit Court of Appeals holding that the Forest Service acted arbitrarily and capriciously in determining that the Forest Plan would not jeopardize the continued existence of listed species, including

-4-

the grizzly bear.  Resources Limited, Inc., v. Robertson, 35 F.3d 1300 (9th Cir. 1993).  The Court of Appeals gave the Forest Service a choice between reinitiating consultation with the Fish & Wildlife Service and amending the Forest Plan to cure the deficiency.  Id. at 1308.  The Forest Service opted to amend the Forest Plan, and did so by implementing Amendment 19 in 1995. Amendment 19 Decision Notice, FWS AR 03680.

Amendment 19 established new Forest-wide standards and objectives for grizzly bear habitat management.  Id. at 03681. Amendment 19's standards require that in each bear management subunit, "there will be no net increase in total motorized access density greater than 2 miles per square mile, no net increase in open motorized access density greater than 1 mile per square mile, and no net decrease in the amount or size of security core area."  Id.  The Amendment's objectives for all subunits made up of at least 75 percent National Forest Land (including the subunits at issue in this case save for the Cedar Teakettle subunit) include:

-    Limitation of high density open motorized access (defined as more than 1 mile of open motorized access per square mile of Forest) to no more than 19 percent of each subunit within 5 years;

-    Limitation of high density total motorized access (defined as more than 2 miles of total motorized access per square mile of Forest) to no more than 24 percent of each subunit within 5 years, and no more than 19 percent of each subunit within 10 years; and

-    Establishment of security core areas that equal or exceed 60

percent of each subunit in 5 years, and 68 percent of each
Subunit in 10 years.

Id.  Taken together, these objectives sought to ensure that by

2005 each subunit would have no more than 19 percent open

motorized access density, no more than 19 percent total motorized

access density, and no less than 68 percent security core

habitat.  The total motorized access density objective is in

effect throughout the year, while the open motorized access

density and security core objectives apply only during the non-

denning period for grizzly bears.  Id. at 03688.  Because this

provision allows for more miles of open road during the winter

months, the Forest Service did not expect Amendment 19 to have a

significant impact on snowmobile recreation.  Id.[2]

When Amendment 19 was adopted in 1995, 16 of the 40 covered

subunits met the 19/19/68 standard.  2005 Amendment 19 Revised

Biological Opinion, FWS AR 08519.  By 2005, the number of

subunits in compliance with the standard had risen from 16 to 18.

Id.  Fifteen subunits met none of the ten-year Amendment 19

---

[2]The Amendment 19 Decision Notice states, "The open motorized
access density and security core area objectives apply only during the
non-denning period, which is generally from November 15 to March 15.
Thus, snowmobiling will not be affected significantly, except in late
spring."  Amendment 19 Decision Notice, FWS AR 03688.  It appears that
the Forest Service transposed the start and end dates of the non-
denning period, which begins on March 15 and ends on November 15.
Such a reading seems more logical since the denning period is
generally understood to span the winter months.  See Selkirk
Conservation Alliance v. Forsgren, 336 F.3d 944, 952 (9th Cir. 2003),
in which the Ninth Circuit wrote, "The Agreement restricts Stimson's
access to its 'closed' roads from April 1-June 15 so as not to
interfere with the critical post-denning period."

standards in 2005, including five of the six subunits in the West
Side Project area and three of the six covered subunits in the
Robert-Wedge Project area.[3]  Id. at 08533, 08535, 08539, 08547,
08548.  The agencies anticipated that the 19/19/68 standard for
access management prescribed by Amendment 19 would not be
realized for every bear management subunit.  "It was understood
by the Forest and the [Fish & Wildlife] Service that when
[Amendment 19] Forest-wide objectives for grizzly bear security
were established, the objectives may be impractical to reach for
some subunits."  Id. at 08483.

The Forest Service wrote to the Fish & Wildlife Service on
May 12, 2000, seeking an extension of the deadline for meeting
Amendment 19's five-year access management objectives.   FWS AR
00610.  The Fish & Wildlife Service responded with a letter
requesting more information from the Forest Service, including an
explanation as to why it failed to meet the five-year objectives.
FWS AR 00612.  In its response dated March 2, 2001, the Forest
Service cited a lack of funding as the primary impediment to
attainment of Amendment 19's management goals.  FWS AR 00566.
The Forest Service explained that budget cuts and increased costs
associated with NEPA compliance, the latter due to heightened

---

[3]The seventh subunit within the Robert-Wedge Project area, the
Cedar Teakettle subunit, is not subject to the 19/19/68 standard and
does not meet that standard.  2005 Amendment 19 Revised Biological
Opinion, FWS AR 08535.

"local resistance" to road closures, had depleted the funds
available for the analysis and implementation of road management
projects, resulting in fewer approved projects than were
anticipated in 1995.  Id.

The dialogue between the agencies culminated in the Forest
Service's request for re-initiation of formal consultation on a
revised implementation schedule for Amendment 19's access
management objectives on December 2, 2004.  FWS AR 08475.  The
Fish & Wildlife Service described the Forest Service's proposed
action as "revis[ing] the 5- and 10-year implementation schedule
proposed in [Amendment 19] to reach the open motorized access,
total motorized access and security core objectives in grizzly
bear subunits through 2009, or until the revision of the Forest
Land and Resource Management Plan is completed, which ever comes
first."  FWS AR 08467.  In its Biological Assessment on the
revised implementation schedule, the Forest Service included the
following elements as part of its proposed action:

- Continue to implement access management in
  existing decisions with timeframes specified in
  the decisions

- Continue to implement access management in other
  existing decisions as funding allows

- Additional restriction of motorized administrative
  use in 9 subunits

FWS AR 08486-08487 (emphasis in original).

The Fish & Wildlife Service acknowledged the reality that

-8-

the Forest Service's proposed revised implementation schedule would not result in compliance with Amendment 19's 19/19/68 standard in all affected subunits by 2009.  "The [Fish & Wildlife] Service recognizes that by the end of 2009, based on the proposed action, all access changes required by [Amendment 19] will likely not be met.  We anticipate that additional formal consultation will be required at that time, in 2010, to address the outstanding access changes required by [Amendment 19]."  FWS AR 08468.  "[A]ccess improvements prior to the end of 2009 are not likely in those subunits that were analyzed in the 1995 [Amendment 19] consultation but currently do not meet [Amendment 19] and do not have decisions authorizing changes."  2005 Amendment 19 Revised Biological Opinion, FWS AR 08484.

The Fish & Wildlife Service's 2005 Amendment 19 Revised Biological Opinion concluded that the proposed revised implementation schedule would not likely jeopardize the continued existence of grizzly bears.  FWS AR 08611.  The Service based its conclusion on a number of considerations, including improvements in security core, open motorized access density and total motorized access density since 1995; expected continued progress toward the 19/19/68 standard through specific improvements to be implemented in scheduled projects; the fact that the Forest Service would build no new roads; the fact that re-consultation would likely occur in 2009; the requirement that the Forest

-9-

Service re-initiate consultation if forthcoming population estimates were to contradict the assumptions underlying the opinion; the fact that mortality is attributable primarily to actions on private lands, not multiple-use federal lands; and the fact that harm to grizzly bears from ongoing fire salvage activity is expected to occur in the form of displacement, not mortality.  2005 Amendment 19 Revised Biological Opinion, FWS AR 08611-08617.  The Robert-Wedge and West Side Projects are among the ongoing fire salvage activities discussed in the 2005 Amendment 19 Revised Biological Opinion.  The opinion includes terms and conditions that augment, but do not replace or modify the project-specific terms and conditions of project-level incidental take statements for approved pending actions, including those set forth in the Robert-Wedge and West Side Biological Opinions.

**B.    The Robert-Wedge Post-Fire Project**

The Robert and Wedge Canyon Fires collectively burned 34,649 acres on the Flathead National Forest.  Robert-Wedge Project Record of Decision, USFS RW AR T-3 at 2.  The human-caused Robert Fire was discovered on the Glacier View Ranger District on July 23, 2003.  The Wedge Canyon Fire was started by a lightning strike on July 18, 2003.  Both fires were fully contained in October 2003.  Id.  The fires burned 66 percent of the Lower Whale Subunit and 37 percent of the Canyon McGinnis Subunit at

varying severity.[4]  2004 Robert-Wedge Biological Opinion, FWS AR
00080.  The fires affected a minimal amount of grizzly bear
denning habitat, but grizzlies are known to use the project area.
Id. at 00080-00081.

After the fires the Congress passed and the President
approved the Flathead and Kootenai National Forest Rehabilitation
Act, which was intended to "accomplish the planning and
rehabilitation of the Robert and Wedge Canyon Fires within a
collaborative environment."  Robert-Wedge Project Record of
Decision, USFS RW AR T-3 at 2.  The special legislation alters
existing land-management statutes by suspending NEPA's
requirement that an environmental impact statement on the project
include any alternative to the proposed agency action and by
mandating that the Fish & Wildlife Service expedite and give
priority to ESA consultation on the project.  Id. at 3.  The
legislation resulted in the consideration of one action
alternative and one "no action" alternative in the Robert-Wedge
Final Environmental Impact Statement.  Id. at 7.  The Forest
Service selected the action alternative (Alternative 2) for the
Robert-Wedge Project, the primary goals of which were to recover
merchantable wood fiber and to aid the recovery of desired

---

[4]Other affected subunits (with percentage burned noted in
parentheses) are the Cedar Teakettle (3), Lower Big Creek (<1)
Ketchikan (28), Upper Trail (14) and Upper Whale Shorty (3) Subunits.
2004 Robert-Wedge Biological Opinion, FWS AR 00080.

vegetation and site conditions within the areas affected by the fires.  Id. at 3.

The Plaintiffs do not challenge the timber-related aspects of the Robert-Wedge Project but rather seek review of the Project's travel management actions.  Of the six project subunits consisting of 75 percent or more federal land, four met or would meet the 19/19/68 standard without the changes prescribed by the chosen alternative.  2004 Robert-Wedge Biological Opinion, FWS AR 00083.[5]  The remaining two subunits would not be brought into compliance with the 19/19/68 standard under the Robert-Wedge Project.  In the Canyon McGinnis Subunit, the Project's travel management decisions meet the 19/19/68 objective only with regard to open motorized access density.  Id. at 00064. The Project leaves total motorized access density at 33 percent (down from 41 percent) and security core habitat at 53 percent (up from 38 percent) in the Canyon McGinnis Subunit.  Id.  The Robert-Wedge Project would leave the Lower Whale Subunit compliant with the total motorized access density standard, but not with the other two.  Open motorized access density would be reduced from 43 to 37 percent, while security core would rise from 45 to 47 percent. Id. at 00066. Although the changes fall short of the Amendment 19

---

[5]The Lower Big Creek Subunit was expected to be brought into compliance with the 19/19/68 standard through implementation of the Moose Post-Fire Project.  2002 Moose Post-Fire Project Record of Decision, USFS RW AR S-4 at 20; 2004 Robert-Wedge Biological Opinion, FWS AR 00083.

-12-

standards, they represent improvements in grizzly bear habitat security over existing conditions.  Robert-Wedge Project Record of Decision, USFS RW AR T-3 at 35.

The Forest Supervisor states in the Robert-Wedge Record of Decision that the 19/19/68 standards cannot be met in the Lower Whale Subunit because 1) the subunit is smaller than average, meaning every mile of road will result in higher density than in the average subunit; 2) achieving the standard for open motorized access density would require prohibiting access to state and private lands within the subunit; and 3) achieving the standard for security core habitat would require restriction of motorized access to several popular recreation opportunities, including the Mt. Thompson Seton trailhead.  Robert-Wedge Project Record of Decision, USFS RW AR T-3 at 35.  The Project will not meet the 19/19/68 standard in the Canyon McGinnis subunit because compliance would require year-round restrictions on two "popular summer motorized access routes" to trailheads near Columbia Falls.  Id.  The implementation schedule for the Robert-Wedge project extends to 2011, and constitutes an approved exception to the 2009 end-date for the revised implementation of Amendment 19. 2005 Revised Amendment 19 Biological Opinion, FWS AR 08486.

The access management aspects of the Robert-Wedge Project are accomplished through the inclusion of two project-specific amendments to the Forest Plan.  The first relaxes Amendment 19's

-13-

standards for open motorized access density and security core standards in the Lower Whale Subunit to 37 percent (from 19 percent) and 47 percent (from 68 percent), respectively.  Robert-Wedge Project Record of Decision, USFS RW AR T-3 at 20.  The second project-specific amendment similarly alters Amendment 19 in the Canyon McGinnis Subunit to allow total motorized access density of 33 percent and security core habitat of 53 percent. Id.

The Forest Service initiated consultation on the Robert-Wedge Project and the project-specific amendments to the Forest Plan by submitting biological assessments to the Fish & Wildlife Service on August 16, 2004.  The Fish & Wildlife Service responded with a Biological Opinion for the grizzly bear in which it concluded that the Robert-Wedge Project would likely result in "incidental take of grizzly bears ... from the displacement effects of road densities and increased road use" but will not result in jeopardy to the continued existence of the bears.[6] 2004 Robert-Wedge Project Biological Opinion, FWS AR 00103-00104. The Fish & Wildlife Service stated that it did not expect the action to result in a grizzly bear mortality.  Id. at 00104.  The Biological Opinion includes mandatory reasonable and prudent

---

[6]Section 9 of the ESA prohibits the "taking" of any endangered species.  16 U.S.C. § 1538(a)(1)(B).  To "take" under the statute is to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

measures for the Forest Service to implement to minimize the impacts of incidental take of grizzlies caused by the Robert-Wedge Project.  Id. at 00105.  The Opinion also includes terms and conditions that the Forest Service is required to follow to be exempt from Section 9 of the ESA regulating take.  Id. at 00105-00107.

## C.   The West Side Post-Fire Project

Lightning storms on August 19, 2003 ignited a series of fires on the Flathead National Forest, known collectively as the West Side Reservoir Fires, that burned 31,600 acres of Forest land.  West Side Project Record of Decision, USFS WS AR T-3 at 2. The area affected by the fires contains extensive grizzly bear denning habitat.  2004 West Side Biological Opinion, FWS AR 00703.  In the aftermath of the fires the Forest Service decided to implement the West Side Reservoir Post-Fire Project, the purpose of which was to recover merchantable wood fiber "while striving to meet the goals and standards of the [Forest Plan]." West Side Project Record of Decision, USFS WS AR T-3 at 13.

As in the case of the Robert-Wedge Project, the Plaintiffs here seek review of only the access management aspects of the West Side Project.[7]  None of the six affected subunits met the

---

[7]Plaintiffs state in their Opening Brief that "[m]ost or all" of the salvage logging has been completed on the Robert-Wedge and West Side Projects, but argue that their claims are not moot because they challenge permanent changes to access management standards achieved through each project's site-specific amendments to the Forest Plan.

19/19/68 standard prior to implementation of the West Side
Project.  2004 West Side Biological Opinion, FWS AR 00722-00723.
The Project calls for temporary increases in open road density
and total road density in some subunits during salvage activity,
followed by permanent reductions in road density and increases in
security core habitat after salvage activity is complete.  Id.
The Project will bring the Jewel Basin Graves, Ball Branch and
Kah Soldier Subunits into compliance with the 19/19/68 standard.
Id.  Site-specific amendments allow for permanent deviation from
the 19/19/68 standard in the Doris Lost Johnny (57/19/36),
Wounded Buck Clayton (27/30/65), and Wheeler Quintonkon
(25/19/68) Subunits.  Id.; West Side Project Record of Decision,
USFS WS AR T-3 at 12.  In the subunits that will not meet
Amendment 19's ten-year standards under the Project, the proposed
action will nonetheless result in improvements in grizzly bear
habitat security over existing conditions. West Side Project
Record of Decision, USFS WS AR T-3 at 18.

The Forest Supervisor cites the elongated shape of the
Wounded Buck Clayton Subunit in explaining why the 19/19/68
standard will not be met in that subunit.  West Side Project
Record of Decision, USFS WS AR T-3 at 19.  A combination of
seasonal and year-round closures will provide substantial

---

Doc. No. 101 at 5-6.  The Defendants do not argue that the case is
moot, and the Court will not address the issue further.

improvement over the status quo in the Wounded Buck Clayton
Subunit.  Id.  The Doris Lost Johnny Subunit was deemed
unsuitable for the necessary closures because it would have
required restriction of trails that "have historically been used
by motorized users and are an important source of recreation."
Id. at 20.  The closure of some trails results in minimal
improvement over existing conditions in the Doris Lost Johnny
Subunit.  Id. at 19.  The Wheeler Quintonkon Subunit will meet
Amendment 19's ten-year objectives in two of three measures,
falling short only in the open road density category (25 percent
instead of the prescribed 19 percent).  Id. at 20.  In order to
lower the open road density to 19 percent the Forest Service
would have had to implement the year-round closure of "the only
access to a popular hiking trial (#64) that leads into the
southern portion of Jewel Basin."  Id.  The closure of some
trails results in modest improvement over existing conditions in
the Wheeler Quintonkon Subunit.  Id. at 19.  The implementation
schedule for the West Side project extends to 2010, and
constitutes an approved exception to the 2009 end-date for the
revised implementation of Amendment 19.  2005 Revised Amendment
19 Biological Opinion, FWS AR 08486.

The Forest Service initiated consultation on the West Side
Project and the project-specific amendments to the Forest Plan by
submitting biological assessments to the Fish & Wildlife Service

-17-

on August 27, 2004.  The Fish & Wildlife Service responded with a
Biological Opinion for the grizzly bear in which it concluded
that the West Side Project would likely result in "incidental
take of grizzly bears ... from the displacement effects of road
densities and road work activity" but will not result in jeopardy
to the continued existence of the bears. 2004 West Side Project
Biological Opinion, FWS AR 00728-00729.  The Fish & Wildlife
Service stated that it did not expect the action to result in a
grizzly bear mortality.  Id. at 00729.  The Biological Opinion
includes mandatory reasonable and prudent measures for the Forest
Service to implement to minimize the impacts of incidental take
of grizzlies caused by the West Side Project.  Id. at 00730.  The
Opinion also includes terms and conditions that the Forest
Service is required to follow to be exempt from Section 9 of the
ESA regulating take.  Id. at 00730-00732.

D.   **The Plaintiffs' Claims**

The Amended Complaint alleges six claims for relief.  Counts
I through V are ESA challenges against the 2004 Robert-Wedge
Biological Opinion, the 2004 West Side Biological Opinion, and
the 2005 Amendment 19 Revised Biological Opinion.[8]  Count I

---

[8]Although Counts I through V allege deficiencies in the 2005
Amendment 19 Revised Biological Opinion, the Amended Complaint does
not request any relief with regard to that document.  The Plaintiffs'
request for relief is confined to the Robert-Wedge and West Side
Biological Opinions.  Doc. No. 94 at 38.  The Court assumes that
Plaintiffs challenge the Robert-Wedge and West Side Biological
Opinions as modified by the 2005 Amendment 19 Revised Biological
Opinion.

alleges that the Fish & Wildlife Service violated the ESA by
failing to assess the Forest-wide impacts of the departures from
the 19/19/68 standard in the Robert-Wedge and West Side Projects.
The Plaintiffs allege in Count II that the Fish & Wildlife
Service's "no jeopardy" findings for the Robert-Wedge and West
Side Projects were arbitrary and capricious because the Service
failed to quantify the expected take of grizzly bears, failed to
explain how additional take does not constitute jeopardy, and
failed to explain how permanent departures from Amendment 19's
ten-year access management objectives can result in no jeopardy.
Count III alleges that the Fish & Wildlife Service violated the
ESA by express incidental take in terms of road densities instead
of quantifying expected take.  In Count IV, Plaintiffs allege an
ESA violation based on the Fish & Wildlife Service's failure to
take into consideration the Interagency Grizzly Bear Guidelines
in assessing the impacts of the Robert Wedge and West Side
projects upon grizzly bears.  Count V alleges that the Fish &
Wildlife Service violated the ESA by failing to consider the best
scientific and commercial data available in preparation of the
Robert-Wedge and West Side Biological Opinions.

Count VI is a NEPA claim in which the Plaintiffs allege that
the Forest Service violated NEPA by failing to consider the
cumulative impacts on grizzly bears of the Robert-Wedge and West
Side Projects.

-19-

The parties have filed cross-motions for summary judgment on all claims.

### III.  Plaintiffs' Motion to Strike

The Plaintiffs have filed a motion to strike from the record a letter dated May 8, 2007, from R. Mark Wilson of the Fish & Wildlife Service to Flathead National Forest Supervisor Cathy Barbouletos.  The letter was sent two days before the administrative record was certified on May 10, 2008, and is included in the administrative record at FWS AR 08465.  The letter reports the results of a United States Geological Survey (USGS) population study for the Northern Continental Divide Ecosystem that was completed after the biological opinions at issue in this case were prepared.  The USGS study found that a minimum of 545 grizzly bears lived in the Ecosystem in 2004.  Id. at 08466.  That figure is substantially higher than the minimum population estimate of 304 bears upon which the Fish & Wildlife Service relied in preparing the biological opinions at issue in this case.[9]

When an agency action is challenged the court must typically

---

[9]The minimum estimate of 304 bears in the Northern Continental Divide Ecosystem in 2004 resulted from the Recovery Plan's minimum estimate method, which assumes that the number of females with cubs sighted and documented within the Ecosystem represents 60 percent of the total population.  FWS AR 08465.  The later USGS study used genetic hair samples recovered throughout the Ecosystem during 2004 to determine that at least 545 different bears lived in the Ecosystem that year.  Id. at 08465-08466.

confine its review to the administrative record.  <u>Fla. Power &
Light Co. v. Lorion</u>, 470 U.S. 743-44 (1985).  The letter
reporting the results of the USGS study constitutes post-
decisional information and may not be relied upon as support for
the conclusions reached in the biological opinions unless it is
necessary to explain the agency's decisions.  <u>Southwest Center
for Biological Diversity v. United States Forest Service</u>, 100
F.3d 1443, 1450 (9th Cir. 1996).  The Ninth Circuit has
identified four narrow exceptions under which a reviewing court
may consider extra-record evidence:

> (1) if admission is necessary to determine "whether the
> agency has considered all relevant factors and has
> explained its decision," (2) if "the agency has relied
> on documents not in the record," (3) "when
> supplementing the record is necessary to explain
> technical terms or complex subject matter,"or (4) when
> plaintiffs make a showing of agency bad faith.

<u>Lands Council v. Powell</u>, 395 F.3d 1019, 1030 (9th Cir. 2005)
(internal quotations omitted).

     The Defendants argue that the letter is part of the
administrative record because the 2005 Amendment 19 Revised
Biological Opinion contains the Fish & Wildlife Service's promise
to reassess its population assumptions once the USGS population
study becomes available.  The Defendants argue that "because [the
Fish & Wildlife Service] predicated [its] 'no jeopardy'
conclusion in part on its assumptions about population status and
expressly stated that those assumptions had to be reassessed when

certain new data became available, the continued validity of the [Biological Opinion] required [the Service] to reassess its assumptions." Doc. No. 105 at 4.

The Fish & Wildlife Service may not rely upon its promise to re-initiate consultation if necessary as the basis for inclusion of the USGS study in the administrative record. The relevant language from the 2005 Amendment 19 Revised Biological Opinion states, "If the estimated population levels are below what we anticipate here, below levels that could reasonably be expected to sustain the anticipated level of adverse impacts, [ESA] section 7 regulations would require reinitiation of consultation." This is merely a restatement of what the law requires. <u>See</u> 50 C.F.R. § 402.16(b) (requiring re-initiation "[i]f new information reveals effects of the action that may affect listed or critical habitat in a manner or to an extent not previously considered"). An agency's promise to fulfill a regulatory mandate that it consider new information does not mean that all future knowledge gained on the subject is part of the administrative record. In accordance with the regulation, the Fish & Wildlife Service stated that it would re-initiate consultation if the population levels are found to be *below* the agency's assumptions. That is not the case here, and the Plaintiffs do not allege that the Fish & Wildlife Service has violated the ESA by failing to re-initiate consultation.

The USGS population study has no relevance to the claims at issue in this case, and does not fall within any of the exceptions set forth in Lands Council.  The Plaintiffs' motion to strike is granted, and the Court will not consider the May 8, 2007 letter setting forth the findings of the USGS population study.

## IV.  Analysis

**A.   Standard of Review Applicable to All Claims**

**1.   Standard of APA Review**[10]

Agency decisions can only be set aside under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Citizens to Preserve Overton Park,

---

[10]The Plaintiffs argue that the Court should apply "particularly careful scrutiny" to the Federal Defendants' actions based on the Forest Service's management record with respect to grizzly bears and because the Forest Service had allegedly doctored interdisciplinary team meeting notes and removed a document from the administrative record.  Doc. No. 101 at 1 n.1.  The Federal Defendants explained in two notices of filing supplements to the administrative record (Doc. Nos. 104 and 112) that one document appeared to be altered because of formatting, one document was altered when the team leader edited interdisciplinary team notes to "focus the notes on documenting the analysis process," Doc. No. 112 at 2, and one document was inadvertently omitted.  All three documents were added in their unaltered form as supplements to the administrative record.  Upon filing of the administrative record, the Plaintiffs were in a position to assess the state of the allegedly altered/omitted documents because they had received original versions of the documents from the Federal Defendants earlier in the case.  See Doc. No. 15; Doc. No. 100 ¶¶ 34, 44-45.  Considering the Federal Defendants supplied the Plaintiffs with the original documents at the outset of the case, it is difficult to believe that the subsequent alterations/omissions were the product of deliberate dishonesty.  In any case, the Plaintiffs' implication of wrongful conduct by the Federal Defendants does not constitute a legal basis for imposing a heightened standard of review.

Inc. v. Volpe, 401 U.S. 402 (1971) (quoting 5 U.S.C. §706(2)(A), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)).  Agency action can be set aside  "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983); Alvarado Community Hospital v. Shalala, 155 F.3d 1115, 1122 (9th Cir. 1998). The court must ask "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... [The court] also must determine whether the [agency] articulated a rational connection between the facts found and the choice made.  [The] review must not rubber-stamp ... administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."  Ocean Advocates v. U.S. Army Corps of Engineers, 361 F.3d 1108, 1119 (9th Cir. 2004) (internal citations and quotations omitted).

## 2.   Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also,
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Summary
judgment is particularly applicable to cases involving judicial
review of final agency action.  Occidental Engineering Co. v.
INS, 753 F.2d 766, 770 (9th Cir. 1985) (citation omitted).
Summary judgment is appropriate in this case because the issues
presented address the legality of the Federal Defendants' actions
based on the administrative record and do not require resolution
of factual disputes.

**B.   Endangered Species Act (Counts I through V)**

**1.   Legal Standard**

Section 7(a)(2) of the Endangered Species Act requires
federal agencies to consult with the Fish & Wildlife Service or
the National Marine Fisheries Services[11] to ensure that any
action authorized, funded or carried out by the agency is not
likely to jeopardize the continued existence of any endangered
species or threatened species or result in destruction or adverse
modification of critical habitat for such species.  16 U.S.C. §
1536(a)(2).  The statute and its implementing regulations
establish a framework for assessing the impacts of a proposed
activity on listed species.  16 U.S.C. § 1536; 50 C.F.R. Part
402.

---

[11]The ESA consulting agency at issue in this case is the Fish &
Wildlife Service.

An agency proposing an action must first determine whether
the action "may affect" species listed as endangered or
threatened under the ESA.  50 C.F.R. § 402.14(a).  If the agency
determines that the proposed action may affect listed species,
formal consultation with the Fish & Wildlife Service is required
except in certain instances.  Id.  The relevant exceptions in
this case allow an action agency to forego formal consultation

> if, as a result of the preparation of a biological
> assessment under § 402.12[12] or as a result of informal
> consultation with the Service under § 402.13,[13] the
> Federal agency determines, with the written concurrence
> of the Director, that the proposed action is not likely
> to adversely affect any listed species or critical
> habitat.

50 C.F.R. § 402.14(b)(1).

Formal consultation requires the Fish & Wildlife Service to
prepare a biological opinion in which the Service advises a
federal agency as to whether the proposed action, whether alone

---

[12]50 C.F.R. § 402.12(a) states that a biological assessment "shall
evaluate the potential effects of the action on listed and proposed
species and designated and proposed critical habitat and determine
whether any such species or habitat are likely to be adversely
affected by the action and is used in determining whether formal
consultation or a conference is necessary."

[13]50 C.F.R. § 402.13(a) provides:

Informal consultation is an optional process that includes
all discussions, correspondence, etc., between the Service
and the Federal agency or the designated non-Federal
representative, designed to assist the Federal agency in
determining whether formal consultation or a conference is
required. If during informal consultation it is determined
by the Federal agency, with the written concurrence of the
Service, that the action is not likely to adversely affect
listed species or critical habitat, the consultation process
is terminated, and no further action is necessary.

or cumulatively with other actions, is likely to jeopardize the continued existence of[14] any listed species or is likely to result in the destruction or adverse modification of any critical habitat.  50 C.F.R. § 402.14(h)(3).  If the Fish & Wildlife Service determines that a proposed action is likely to result in jeopardy or loss of critical habitat, the Service must set forth reasonable and prudent alternatives to the action, if any.  16 U.S.C. § 1536(b)(3)(A).  If the Service determines that a proposed action will result in incidental take of listed species but that the action and associated incidental take will not violate the ESA Section 7 jeopardy standard, the Service must attach an incidental take statement to the biological opinion.  16 U.S.C. § 1536(b)(4); 50 C.F.R. 402.14(i)(1).  The incidental take statement sets forth the predicted impact to listed species, the reasonable and prudent measures that are necessary to minimize take, and the terms and conditions for the implementation of those measures.  Id.  If the action agency complies with the terms and conditions of the incidental take statement, the expected take is exempted from the take prohibition set forth in ESA Section 9 (16 U.S.C. § 1538(a)(1)(b)).  16 U.S.C. § 1536(o)(2).

---

[14]50 C.F.R. § 402.02 provides that "'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."

While consultation is ongoing, ESA Section 7(d) prohibits action agencies from making an "irreversible or irretrievable" commitment of resources "which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative" to the agency action. 16 U.S.C. § 1536(d). This prohibition is effective upon initiation of consultation and continues until consultation is concluded. Id.; 50 C.F.R. § 402.09.

With regard to actions over which the federal agency remains in control or with which the federal agency has discretionary involvement, re-initiation of formal consultation is required in the following instances:

(a) If the amount or extent of taking specified in the incidental take statement is exceeded;

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16.

ESA Section 7's "no jeopardy" standard does not confer upon the action agency the affirmative obligation to promote the recovery of a listed species. As the Ninth Circuit wrote in

-28-

Southwest Center for Biological Diversity v. U.S. Bureau of
Reclamation, 143 F.3d 515 (9th Cir. 1998):

> [U]nder the ESA, the Secretary was not required to pick
> the first reasonable alternative the FWS came up with
> in formulating the RPA.  The Secretary was not even
> required to pick the best alternative or the one that
> would most effectively protect the Flycatcher from
> jeopardy.  The Secretary need only have adopted a final
> RPA which complied with the jeopardy standard and which
> could be implemented by the agency.

Id. at 523 (internal citation omitted).  The court went on to
say:

> The district court correctly held that the only
> relevant question before it for review was whether the
> Secretary acted arbitrarily and capriciously or abused
> his discretion in adopting the final RPA.  In answering
> this question, the court had only to determine if the
> final RPA met the standards and the requirements of the
> ESA.  The court was not in a position to determine if
> the draft RPA should have been adopted or if it would
> have afforded the Flycatcher better protection.

Id.

**2.   ESA Claims**

The Plaintiffs' Amended Complaint lists five ESA counts but
lacks clarity regarding the particular basis for each count.
There is a significant amount of overlap among the legal
challenges underlying the counts, and a number of distinct
alleged deficiencies are raised in more than one count.  For that
reason, the ESA claims are analyzed using the framework of
arguments set forth in the Plaintiffs' Opening Brief (Doc. No.

101), with the relevant count(s) noted in parentheses.[15]

### a.   Failure to Quantify Incidental Take Statements (Counts I, II, and III)

In both the Robert-Wedge and West Side Biological Opinions, the Fish & Wildlife Service issued incidental take statements in which the Service anticipated that the projects would result in take of grizzly bears in the form of displacement caused by adverse habitat modification.  The Service did not expect either project to result in a grizzly bear mortality.  FWS AR 00104, 00728-00729.  The West Side Biological Opinion states that the amount of take anticipated is unquantifiable, and therefore the Service must rely upon surrogate measures of road density and security core habitat to "limit and monitor the displacement impacts and resulting level of incidental take with the status of the [Amendment 19] standards and amended standards in each subunit."  FWS AR 00732.  The Robert-Wedge Biological Opinion similarly concludes that take is unquantifiable and provides that "[t]he Service will gauge the level of incidental take with the status of the [Amendment 19] standards and amended standards in each subunit."  FWS AR 00107.

The terms and conditions imposed in the Biological Opinions

---

[15]The allegations set forth in Count V, charging that the Fish & Wildlife Service failed to consider the best available scientific and commercial data in preparing the challenged biological opinions, are not argued in the briefing and appear to have been abandoned by the Plaintiffs.  The Court will therefore grant summary judgment in favor of the Defendants on Count V.

reflect this surrogate approach by requiring the Forest Service
to bring all affected subunits in the Robert-Wedge and West Side
Projects into compliance with the Amendment 19 ten-year
objectives or the site-specific amendments to those objectives
within a specified period of time.  FWS AR 00730 (requiring
completion of road decommissioning by 2010 for the West Side
Project); FWS AR 00105-00106 (requiring decommissioning to be
completed with five years of the end of harvest activities for
the Robert-Wedge Project).  The terms and conditions also limit
salvage activities in security core habitat, prohibit salvage
activities during the spring post-denning period, and require the
Forest Service to issue regular reports on harvest activity and
progress toward the road management objectives.  FWS AR 00730-
00732, 00105-00107.

An incidental take statement exempts an action agency from
ESA Section 9 liability for the level of take expected to occur
as the result of an approved activity if the agency complies with
the incidental take statement's terms and conditions.  16 U.S.C.
§ 1536(o)(2); <u>Arizona Cattle Growers' Association v. United
States Fish & Wildlife Service</u>, 273 F.3d 1229, 1239 (9th Cir.
2001) ("<u>ACGA</u>").  The incidental take statement must include a
"trigger" expressed in terms of the maximum level of acceptable
take.  When that trigger is reached, the incidental take
statement's "safe harbor" function is invalidated and the parties

must re-initiate consultation before the action agency can continue to be exempt from ESA Section 9 liability.  ACGA, 273 F.3d at 1249.  Congress has declared a preference that the anticipated level of take and the trigger be expressed as a specific number, but recognized that in some instances establishment of a numerical figure would be impossible.  H.R. Rep. No. 97-567, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2827.  Where a numerical value cannot practically be obtained, the Fish & Wildlife Service may express take using ecological conditions as a surrogate, provided that there is a scientifically supported link between the ecological surrogate and the take of the protected species *and* the Service has given an adequate explanation as to why numerical expression of take is impractical.  ACGA, 273 F.3d 1250 (citing Final ESA Section 7 Consultation Handbook, March 1998 at 4-47 to 4-48); Oregon Natural Resources Council v. Allen, 476 F.3d 1031, 1037-1038 (9th Cir. 2007) ("ONRC").

The Plaintiffs argue that the Fish & Wildlife Service's use of road density and security core measurements as a surrogate for a quantified statement of anticipated take violates the ESA. According to the Plaintiffs, the Service has failed to comply with the law for the following reasons: (1) the Service has made no effort to quantify the anticipated take and has failed to explain why quantification is impossible; (2) access limitations

-32-

are an unacceptable surrogate because they are co-extensive with the scope of the projects; and (3) the surrogate measures provide no trigger to alert the Forest Service as to when the acceptable level of take has been exceeded.

The use of road density and security core habitat measurements as a surrogate for numerically expressed take of grizzly bears is an established practice of the Fish & Wildlife Service. The 1995 Amendment 19 Biological Opinion's 19/19/68 standard is nothing more than the expression of take in the form of access management measurements. 1995 Amendment 19 Biological Opinion Amended Incident Take Statement (Doc. No. 104-2 at 3-7). In their Opening Brief, the Plaintiffs appear to take issue with the very practice of relying upon road density and core habitat measurements as surrogates for quantified take statements and allege that the Fish & Wildlife Service has never provided an adequate explanation as to why take of grizzly bears cannot be quantified. Doc. No. 101 at 9 (alleging that the Service "made no effort to quantify the numbers of bears to be harmed, and made virtually no effort to explain why it could not do so").

The Plaintiffs narrow the scope of their challenge in their Reply Brief. They concede as a general proposition the legitimacy of the use of road density and core habitat as surrogates for incidental take, stating that they "[do] not dispute [the Fish & Wildlife Service's] use of the 19/19/68

-33-

standards derived from the South Fork grizzly studies by Mace and Manley as identifying the line separating habitat conditions which cause harm to bears from those that do not." Doc. No. 113 at 4. Implicit in this statement is the concession that the Fish & Wildlife Service adequately explained in the 1995 Amendment 19 Biological Opinion why quantification of incidental take of grizzly bears is impossible.[16]

These concessions clarify that the Plaintiffs' quarrel is not with the use of road density and core habitat as a surrogate,

---

[16]The amended incidental take statement accompanying the 1995 Amendment 19 Biological Opinion explains:

> It is the biological judgment of the Service that the existing high road densities in the environmental baseline of several [bear management unit] Subunits results in significant habitat modification or degradation which results in actual injury to grizzly bears by significantly disrupting normal behavioral patterns, including breeding, feeding or sheltering....

> The effects of the proposed Amendment are largely unquantifiable in the short term, and may be measurable only as long-term effects on the species' habitat and population levels. Therefore, even though the Service believes incidental take will occur from the effects of the proposed Amendment, the best scientific and commercial data available are not sufficient to enable the Service to quantify a specific amount of incidental take of the species itself. In instances such as these, the Service designates the expected level of take as unquantifiable.

Doc. No. 104-2 at 3. The Robert-Wedge and West Side Biological Opinions contain similar statements explaining that because the projects are expected to result in habitat displacement but not mortality, the extent of take will be difficult to detect and is unquantifiable. FWS AR 00104, 00729. As the Defendants put it, "it is impossible to say how many fewer bear cubs will exist in the future" as a result of habitat displacement. Doc. No. 110 at 18. The administrative record adequately explains why incidental take cannot be quantified for the challenged actions.

but rather with the specific levels of road density and core habitat authorized in the subunits that are subject to site-specific amendments.  Plaintiffs contend that while a surrogate using the 19/19/68 standard is reasonable because it is based on a scientific study,[17] the surrogates in this case, which employ sub-19/19/68 standards in subunits subject to site-specific amendments, "have no science-based relationship to the take of grizzlies,"  Doc. No. 113 at 5, and therefore it is arbitrary and capricious to rely on those standards to measure incidental take.

The Plaintiffs' argument misunderstands the requirement that a surrogate be linked to the take of a species.  They are incorrect in stating that the sub-19/19/68 standards have no scientific basis or relationship to the take of grizzlies.  To the contrary, any road density and core habitat standard, regardless of the percentages used, is a measure of ecological conditions that are directly linked to grizzly bear habitat displacement.  It is irrelevant whether the standard is 19/19/68 or 27/30/65, as the West Side Biological Opinion provides for the Wounded Buck Clayton Subunit.  FWS AR 00725.  In either case, the standard measures ecological conditions that are linked to take.  The 19/19/68 standard is the scientifically determined threshold

---

[17]The 1995 Amendment 19 Biological Opinion relies upon several biological studies in establishing the 19/19/68 standards, most notably the South Fork Study (Mace and Manley 1993) at FWS AR 04004. 1995 Amendment 19 Biological Opinion Amended Incident Take Statement (Doc. No. 104-2).

beyond which road density and absence of core habitat will result in under-use of habitat by adult female grizzlies with cubs. 1995 Amendment 19 Biological Opinion Amended Incident Take Statement (Doc. No. 104-2 at 3-5).

Rather than having no basis in science, the sub-19/19-68 standards set forth in the incidental take statements for the Robert-Wedge and West Side Projects allow for the scientific conclusion that under-use of habitat will occur in those subunits that are subject to site-specific amendments.  The Fish & Wildlife Service acknowledges this fact in the Robert-Wedge and West Side Biological Opinions.  FWS AR 00104, 00728-00729.  To the extent the Plaintiffs argue that the Service acted in an arbitrary and capricious manner by approving the Robert-Wedge and West Side Projects despite the expected level of habitat displacement, that is an argument against the validity the Service's "no jeopardy" conclusions and does not relate to the legality of the incidental take statements.  The Plaintiffs' arguments as to whether the Service's "no jeopardy" conclusions are arbitrary and capricious are discussed in greater detail below.  With regard to the incidental take statements, the Service has established that take due to displacement cannot be quantified and that road density and core habitat are appropriate ecological surrogates bearing a causal link to harm to grizzly bears.

-36-

The Plaintiffs allege that the incidental take statements are nonetheless invalid because they are co-extensive with the Projects and therefore fail to provide a clear trigger for when the approved level of take is exceeded.  Plaintiffs cite ONRC, in which the Fish & Wildlife Service issued an incidental take statement exempting the take of "'all spotted owls associated with the removal and downgrading of 22,227 acres of suitable spotted owl habitat.'"  476 F.3d 1031.  The Ninth Circuit ruled the incidental take statement and biological opinion invalid because "they both define and limit the level of take using the parameters of the project."  Id.  The court explained that this type of "tautological" incidental take statement lacks a trigger by which the agencies can monitor compliance and determine whether excessive take requires re-initiation of consultation. Id. at 1039-1041.

Important distinctions undermine the Plaintiffs' efforts to liken the incidental take statements at issue here to the one that was rejected in ONRC.  The incidental take statements contain adequate triggers in the form of deadlines for attainment of the road density and core habitat standards established for each subunit.  FWS AR 00730 (requiring completion of road decommissioning by 2010 for the West Side Project); FWS AR 00105-00106 (requiring decommissioning to be completed with five years of the end of harvest activities for the Robert-Wedge Project).

-37-

Implementation deadlines were used as a trigger in Amendment 19's five- and ten-year implementation schedules.  As described above, Amendment 19's deadlines were effective in triggering re-initiation of consultation once Forest Service activities exceeded the approved level of take.  In ONRC, there was no conceivable circumstance under which the project would exceed the approved level of take.  Here, the Forest Service need only fail to complete the prescribed road decommissioning by the specified dates to exceed approved take and trigger re-initiation. Moreover, unlike the project in ONRC, the projects at issue here will result in improved habitat conditions for grizzly bears over the current situation.  The incidental take statements in this case also contain terms and conditions that limit salvage activities in security core habitat, prohibit salvage activities during the spring post-denning period, and require the Forest Service to issue regular reports on harvest activity and progress toward the road management objectives.  No such detailed terms and conditions accompanied the incidental take statement in ONRC. 476 F.3d at 1039.

More importantly, the Fish & Wildlife Service's estimate that no grizzly bear mortalities will result from the site-specific amendments gives the Court confidence that the agencies will re-initiate consultation should any human-caused grizzly bear mortalities occur within the affected subunits.  In light of

the Fish & Wildlife Service's statement that it does not expect
mortality to result, any human-caused mortality in affected
subunits would "reveal[] effects of the action that may affect
listed species or critical habitat in a manner or to an extent no
previously considered," and therefore trigger re-initiation of
consultation under 50 C.F.R. § 402.16(b).  It is the Court's
expectation that re-initiation of consultation would occur upon
the discovery of any human-caused grizzly bear mortality in the
subunits subject to site-specific amended road management
standards in the Robert-Wedge and West Side Project areas.

The incidental take statements for the Robert-Wedge and West
Side Projects provide clear triggers for re-initiation and
contained detailed terms and conditions.[18]  The Court grants
summary judgment in favor of the Defendants on the question of
the validity of the incidental take statements.

> **b.    The Fish & Wildlife Service's "No Jeopardy"
>         Findings**

Plaintiffs allege that the Fish & Wildlife Service's "no
jeopardy" findings expressed in the Robert-Wedge and West Side
Biological Opinions are arbitrary and capricious for four
reasons.  First, Plaintiffs argue that the environmental baseline

---

[18]The existence of clear triggers for re-initiation of
consultation in the Robert-Wedge and West Side Biological Opinions
renders unpersuasive the Plaintiffs' argument that the incidental take
statements are invalid because the Fish & Wildlife Service has
retained sole discretion to determine whether the approved level of
take has been exceeded.

from which the Service assesses the impact of the Projects is
flawed because it fails to account for road density and core
habitat improvements that would be realized upon full
implementation of Amendment 19's management objectives.  Second,
Plaintiffs contend that the Service has failed to adequately
explain why sub-19/19/68 standards will not result in jeopardy to
grizzly bears.  The Plaintiffs' third argument is that the
Service's findings are arbitrary and capricious because the state
of grizzly bear mortality rates in the Northern Continental
Divide Ecosystem.  Finally, Plaintiffs complain that the Fish &
Wildlife Service failed to ensure that the Projects are
consistent with the Interagency Grizzly Bear Guidelines.

   i.   **Environmental Baseline (Counts I and II)**[19]

     In preparing a biological opinion on a proposed action, the
Fish & Wildlife Service is required to "evaluate the effects of
the action."  50 C.F.R. § 402.14.  The term "effects of the
action" is defined in the ESA's implementing regulations as:

     the direct and indirect effects of an action on the
     species or critical habitat, together with the effects
     of other activities that are interrelated or
     interdependent with that action, that will be added to
     the environmental baseline. The environmental baseline
     includes the past and present impacts of all Federal,
     State, or private actions and other human activities in

-----

[19]The term "environmental baseline" does not appear in any of the
Counts alleged in the Amended Complaint.  The argument can fairly be
read to be subsumed within the generalized allegations in Counts I and
II relating to the Service's "no jeopardy" finding for site-specific
amendments to road density and core habitat.

the action area, the anticipated impacts of all
proposed Federal projects in the action area that have
already undergone formal or early section 7
consultation, and the impact of State or private
actions which are contemporaneous with the consultation
in process.

50 C.F.R. § 402.02.  The Service's Section 7 Consultation

Handbook adds:

The baseline includes State, tribal, local, and private
actions already affecting the species or that will
occur contemporaneously with the consultation in
progress. Unrelated Federal actions affecting the same
species or critical habitat that have completed formal
or informal consultation are also part of the
environmental baseline, as are Federal and other
actions within the action area that may benefit listed
species or critical habitat.

Final ESA Section 7 Consultation Handbook, March 1998 at 4-22.

In establishing the environmental baselines for the Robert-

Wedge and West Side Biological Opinions, the Fish & Wildlife

Service considered the existing conditions as they are expected

to be modified by specific projects that had been approved but

not fully implemented.  FWS AR 00079-00083; 00701-00707.  The

Plaintiffs argue that the Fish & Wildlife Service acted

arbitrarily and capriciously by defining the environmental

baseline using "on-the-ground road density conditions existing at

the time the [Biological Opinions] were prepared."  Doc. No. 101

at 13.  The Plaintiffs insist that the Service should have

instead evaluated the impacts from an environmental baseline that

assumes that Amendment 19's access management goals would be

fully achieved on the original five- and ten-year implementation

-41-

schedules.  When viewed from this perspective, the Plaintiffs
argue, the improvements in grizzly bear habitat conditions
brought about by the Robert-Wedge and West Side Projects are
"illusory."  Doc. No. 101 at 15.

There is no legal support for the Plaintiffs' position.  The
language of 50 C.F.R. § 402.02 and the Consultation Handbook is
clear that in setting the environmental baseline the Service must
take into account the future impacts of approved federal
"actions" and proposed federal "projects" that have already
undergone formal consultation.  Amendment 19 is not an action or
a project; it is a part of the Forest Plan, which is a
programmatic document that does not authorize any specific
projects and does not obligate the Forest Service to undertake
specific projects.  The Plaintiffs do not cite a single statute,
case, or regulation directing the Fish & Wildlife Service to
consider programmatic planning documents in setting the
environmental baseline.

The improvements to grizzly bear habitat that will result
from the scheduled implementation of the challenged projects are
not illusory—the projects will create more habitat for grizzlies
in the affected subunits than existed prior to implementation.
The Plaintiffs' advocate an aspirational conception of the
existing situation that would lead to a perverse outcome in which
the Service must reject a project that improves conditions

-42-

because it does not improve them enough.  Such an approach
undermines the utility of the evaluation of the effects of an
action and is not required by the law.  Summary judgment is
granted in favor of the Defendants on this issue.

> **ii.  Amended Access Management Standards (Counts I and II**)

The Forest Service's 1994 Amendment 19 Environmental
Assessment and the Fish & Wildlife Service's 1995 Amendment 19
Biological Opinion both discuss the importance using of
programmatic planning to achieve secure grizzly bear habitat
conditions Forest-wide.  FWS AR 03872, 03628.  The 1995 Amendment
19 Biological Opinion's road density and core habitat standards,
prescribed for each subunit consisting of 75 percent or more
federal ownership, were intended to reduce the risks to the
grizzly population resulting from excessive road density.  The
Fish & Wildlife Service predicated its "no jeopardy" finding for
Amendment 19 in part on the fact that "[m]otorized access
management comparable to or improved over that in the composite
home range of adult females in the South Fork Study area would be
applied to all areas of the recovery zone on the Forest . . . ."
FWS AR 03640.

The Plaintiffs challenge the Fish & Wildlife Service's
finding of "no jeopardy" associated with the relaxed road density
standards applied to certain subunits in the Robert-Wedge and
West Side Project areas, stating that the Service has offered "no

rational explanation for later retreating from its emphasis on
protecting Forest-wide habitat conditions to support the
Flathead's wide-ranging grizzlies." Doc. No. 101 at 16. Because
the "no jeopardy" finding on Amendment 19 assumed forest-wide
implementation of the 19/19/68 standards, Plaintiffs argue, the
Fish & Wildlife Service must explain why exceptions to the
comprehensive scheme do not undermine its effectiveness.

The Plaintiffs' argument is flawed in that it misstates the
legal standard against which the projects must be reviewed. The
Fish & Wildlife Service is not required to reconcile a biological
opinion issued in 2004 with a biological opinion issued nine
years earlier in 1995; the Service need only provide a rational
explanation for its jeopardy determination. Neither the Fish &
Wildlife Service nor this Court is responsible for ensuring that
the Forest Service's proposed actions comply with Amendment 19 as
written in 1995. Once the Forest Service proposed site-specific
amendments to the road density standards, the function of the
Fish & Wildlife Service was to determine whether those amendments
would jeopardize the continued existence of grizzly bears and, if
not, whether any incidental take of grizzly bears would result.

The Plaintiffs' argument assumes that the Fish & Wildlife
Service and the Forest Service are forever wedded to the 19/19/68
standard, and that any deviation from that standard cannot
support a finding of no jeopardy. This assumption might be valid

-44-

if the Fish & Wildlife Service relied on nothing other than road density and security core to assess the status of the species, and if it is assumed that even the most minimal degree of habitat displacement will jeopardize the continued existence of the species.  In reality, the Fish & Wildlife Service considers a number of factors in making a jeopardy determination, and did so in this case.  In addition to the fact the projects would improve existing road densities, the Fish & Wildlife Service based its "no jeopardy" opinions on the following considerations: short duration of salvage activities; the imposition of seasonal restrictions on salvage activities; review of the Amendment 19 Biological Assessment and Biological Opinion; recent survey work suggesting that the population parameter used underestimates the grizzly bear population; and information not statistically validated suggesting that the population in the Northern Continental Divide Ecosystem is expanding.  FWS AR 00100-00103; 00725-00727 (summarizing the factors considered).  The Fish & Wildlife Service also noted in the West Side Biological Opinion that the majority of human-caused mortalities in the Ecosystem are due to management removal of habituated bears, collision with trains, and illegal killings, and that most habituation occurs on rural private land rather than on multiple-use federal lands. FWS AR 00727.

　　These and other considerations are discussed in sufficient

detail in the challenged Biological Opinions, resulting in an rational explanation of the "no jeopardy" findings.   FWS AR 00063-00068, 00075-00078, 00082-00083, 00093-00097, 00100-00103, 00682-00685, 00697-00699, 00705-00713, 00716-00722.   The Plaintiffs' insistence that the Service's explanation of its jeopardy determination be analyzed in the context of Amendment 19 has no basis in the law and cannot serve as a ground to invalidate the challenged biological opinions under the APA's deferential standard of review.   Summary judgment is granted in favor of the Defendants on this issue.

### iii. Grizzly Bear Mortality (Counts I and II)

Plaintiffs complain that "[d]espite record mortality levels [in the Northern Continental Divide Ecosystem]," the Fish & Wildlife Service "did not even make an effort to estimate these projects' likely contributions to bear mortality, much less explain why further increases in grizzly deaths would not jeopardize the species."  Doc. No. 101 at 19.  The Plaintiffs' argument ignores the findings of the Biological Opinions regarding grizzly bear population trends and the projected impact of the actions on grizzly bears.

The Plaintiffs imply that the grizzly bear population is in decline, noting that the Environmental Impact Statement for the West Side Project reports a 69 percent chance that the South Fork population is in decline and both the West Side and Robert-Wedge

Biological Opinions state that the present population in the Northern Continental Divide Ecosystem is unknown.  While the Service does state in the biological opinions that the exact size of the population is unknown, FWS AR 00073, 000693, the most recent available information led the Service to conclude that the population is stable or increasing.  FWS AR 00695, 08503-08509.  The Plaintiffs might dispute this conclusion, but the Court is not in a position to invalidate agency conclusions having plausible support in the record, as this one does.  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377 (1989) (calling for deference to agency expertise where resolution of a dispute "involves primarily issues of fact").

More problematic for the Plaintiffs is the fact that their argument presupposes that the projects will result in grizzly bear mortalities, an assumption that is at odds with the Fish & Wildlife Service's conclusion that the projects will likely result in displacement but not mortality.  FWS AR 00103-00140, 00729, 08618.  The Plaintiffs cite Rock Creek Alliance v. United States Forest Service, 390 F. Supp. 2d 993, 1008 (D.Mont. 2005), for the proposition that even one projected grizzly bear death in a population of fewer than 40 bears requires an adequate explanation.  Here there are no projected deaths and the bear population numbers in the hundreds.  Moreover, the projects here will improve conditions for the bears resulting in more usable

habitat and reducing mortality risks.

The Plaintiffs' refusal to move beyond their environmental baseline position and acknowledge the conditions for the bears as they exist continues to undermine their arguments.  The Fish & Wildlife Service has adequately explained its determination that the projects will not result in mortality and will improve the habitat situation for grizzly bears.  Where there is no expectation of mortality, the Service is under no obligation to explain why increases in mortality are acceptable.  The Court grants summary judgment in favor of the Defendants on this issue.

### iv.  Compliance with the Interagency Grizzly Bear Guidelines (Count IV)

Plaintiffs allege that the Robert-Wedge and West Side Biological Opinions are arbitrary and capricious because the Fish & Wildlife Service "failed to consider [the projects'] consistency with the requirements of the Interagency Grizzly Bear Guidelines . . . ."  Doc. No. 101 at 19.  As is noted above, the Guidelines and accompanying Management Situation designations are incorporated into the Forest Plan through Amendment 9 and are binding upon the Forest Service.  Forest Plan, USFS  WS AR S-1 at Amendments, p. 1 and Appendix OO.  The Guidelines are not, however, binding on the Fish & Wildlife Service, and the biological opinions at issue contain no explicit reference to the Guidelines.

The Plaintiffs attempt to bring the Fish & Wildlife Service

within the purview of the Guidelines by quoting this Court's statement in Alliance for the Wild Rockies v. United States Fish & Wildlife Service, CV 04-216-M-DWM (D. Mont. Aug. 29, 2006) (Doc. No. 59 at 15-16), that "[t]he Guidelines themselves do not have legal force, except to the extent that an agency decision could become arbitrary or capricious because of its expressed adherence to and later contradiction with the Guidelines." Such a situation exists here, Plaintiffs contend, because the Fish & Wildlife Service cited the Forest's promised adherence to the Guidelines as part of its basis for concluding that Amendment 19 would not result in jeopardy, FWS AR 06327, but did not discuss the Guidelines in the Robert-Wedge and West Side Biological Opinions issued nine years later. The Plaintiffs imply that the failure to expressly consider the Guidelines is meaningful because the projects fail to favor the needs of the grizzly bear when grizzly habitat and other land use values compete as required by the Guidelines. 51 Fed. Reg. 42865.

The argument fails because even if it is assumed that the quoted statement in Alliance applies here—a tenuous assumption given the interval between the 1995 Amendment 19 Biological Opinions and the 2004 Robert-Wedge and West Side Biological Opinions—the Fish & Wildlife Service runs afoul of Alliance only if it approves an action that contradicts the Guidelines. The Plaintiffs' proffered ground for concluding that such a

-49-

contradiction exists is the fact that the Forest Service cited multiple use objectives, particularly the preservation of roaded access to recreation opportunities, in explaining why the 19/19/68 standards could not be met in the subunits subject to site specific amendments.  Such a choice fails to favor the needs of the bear when land uses compete, Plaintiffs argue, and therefore the Fish & Wildlife Service contradicted the Guidelines by reaching a "no jeopardy" finding with regard to the Forest Service's proposed actions.

In <u>Swan View Coalition v. Barbouletos</u>, CV 03-112-M-DWM (D. Mont. Dec. 12, 2006) (Doc. No. 60), a case dealing with the Flathead National Forest Plan, this Court discussed in detail the Guidelines' requirement that management decisions favor the bear when land uses compete in Management Situation 1 areas.  <u>Id.</u> at 47-56.  The Court concluded that the directive that the needs of the bear prevail is not absolute and there is no requirement that those needs be promoted to the exclusion of all other uses.  <u>Id.</u> at 52.  The Court quoted the Forest Plan's provision that "[i]n Situations 1 and 2, when recreational use is determined to exceed grizzly tolerance levels as determined through biological analysis, some means of restriction or reduction of human use should be implemented."  <u>Id.</u> (citing USFS  WS AR S-1 at II-42). The Court found that "for purposes of the Forest Plan, the needs of the grizzly bear do not 'compete' with other uses, and

therefore gain preference over other uses, until those uses
manifest a demonstrable negative effect on grizzlies or their
habitat."  Id. at 52-53.

After noting that both the Forest Service and the Fish and
Wildlife Service had determined that the negative effects on
grizzlies of the challenged project would be minimal, and that
the project would in fact improve existing conditions, the Court
concluded as follows with regard to the action's compliance with
the Guidelines:

> It is clear from the record in this case that,
> from a travel management standpoint, the Forest
> Service's top priority in approving the Moose Project
> was to find a way around the requirement that it give
> top priority to the needs of the grizzly bear.  This
> becomes precariously close to political management of
> land use.  But, the Plan does not require that the
> needs of the grizzly be elevated to the exclusion of
> all other considerations, and the Forest Service's
> actions, while objectionable, and perhaps disagreeable,
> are not so egregious that the decision must be set
> aside.  This case presents a difficult question of
> Forest Plan interpretation: How much conflict must
> exist between two land uses before they can be said to
> "compete?"  The grizzly bear is most certainly in
> greater danger of extinction than the snowmobiler or
> the huckleberry picker.   If the management guidance in
> the Forest Plan is limited to a single proposition that
> decisions must favor the needs of the grizzly where
> uses compete, then the Forest Service has run afoul of
> the Plan.  But the Forest Plan does not provide such a
> singular directive.  It allows for consideration of
> multiple use even under these circumstances.
>
> The APA requires judicial deference and the burden
> is on the Plaintiffs to show that the agencies acted
> arbitrarily and capriciously or otherwise not in
> accordance with law.  Under this Forest Plan, that
> means the Plaintiffs must show that the Forest Service
> chose against the grizzly's recovery when the evidence

> before it showed that the action would have a
> demonstrable negative impact on that recovery.  The
> Plaintiffs have failed to make that showing here.

Id. at 54-55.

The facts of this case call for the same result.  The Plaintiffs have failed to establish that the evidence available to the agencies showed that the action would have a demonstrable negative effect on the grizzly.  To the contrary, the projects will promote the recovery of the grizzly (albeit to a lesser degree than if the 19/19/68 standards were met in every affected subunit) by reducing road density, increasing core habitat, and curbing the existing degree of under-use of habitat in the affected subunits.  The Fish & Wildlife Service did not act in contravention of the Guidelines by issuing "no jeopardy" findings for the proposed projects.  The challenged projects, while reflective of the Forest Service's unwillingness to help the bear beyond the minimum that the law requires, are consistent with the Guidelines, and it was not arbitrary and capricious for the Fish & Wildlife Service to conclude that they will not jeopardize the continued existence of the species.  The Court therefore grants summary judgment in favor of the Defendants on this issue.

## C.   National Environmental Policy Act (Count VI)

### 1.   Legal Standard

NEPA is intended to focus the attention of the government and the public on the likely environmental consequences of a

proposed agency action.  Marsh, 490 U.S. at 371.  The Act "places on the agency the obligation to consider every significant aspect of the environmental impact of the proposed action" and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97 (1983) (citations omitted).

NEPA imposes procedural obligations on government agencies. "NEPA does not work by mandating that agencies achieve particular substantive environmental results."  Marsh, 490 U.S. at 371. NEPA dictates the necessary procedure an agency must follow, but does not state any requirements relating to the outcome of the agency's decision making process.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989).

NEPA requires a federal agency to prepare an environmental impact statement detailing the environmental impacts of  "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This obligation includes the duty to consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(7).  "If several actions have a cumulative environmental effect, 'this consequence must be considered in an [environmental impact statement].'" Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1214

(9th Cir. 1998) (quoting Neighbors of Cuddy Mountain v. United States Forest Service, 137 F.3d 1372, 1378 (9th Cir. 1998)).

The environmental impact statement must describe the environmental impacts of the proposed agency action, any adverse environmental impacts of the proposed action that cannot be avoided, and alternatives to the proposed action which were considered by the agency.  Robertson, 490 U.S. at 349.   The scope and nature of the direct, indirect, and cumulative impacts analysis is a matter committed to the sound discretion of the agency.  Kleppe v. Sierra Club, 427 U.S. 390, 413-14 (1976).  If the nature and scope of the analysis is challenged, the reviewing court may only examine whether "the agency has taken a 'hard look' at the environmental consequences."  Inland Empire Public Lands Council v. U.S. Forest Service, 88 F.3d 754, 763 (9th Cir. 1996) (quoting Kleppe, 427 U.S. at 410 n. 21).  A court may not interject itself within the area of discretion of the executive as to the choice of the action to be taken; only if the agency's analysis of the environmental impact is "arbitrary and capricious" or "contrary to the procedures required by law" can the reviewing court conclude that the agency did not take the requisite "hard look."  Kleppe, 427 U.S. at 410 n. 21; Inland Empire, 88 F.3d at 763.

   **2.   NEPA Claim**

The Court's September 27, 2006 Order denying the Plaintiffs'

motion for preliminary injunction finds that the environmental impact statements at issue in this case adequately discuss cumulative affects because "[b]oth [environmental impact statements] contain a summary of all past, ongoing, and reasonably foreseeable future Forest Service actions in areas affected by the projects." Doc. No. 86 at 10-11. The Plaintiffs argue that the Court applied an incorrect legal standard for assessing the scope of the Forest Service's inquiry and that the determination itself is "factually inaccurate" because the Forest Service failed to adequately discuss the cumulative impact of forest-wide actions and the then-proposed Amendment 24 dealing with snowmobile access. Doc. No. 101 at 22.

The scope of the Court's analysis is erroneous, Plaintiffs argue, because the Service must assess the cumulative impacts of all actions forest-wide, not just the impacts of "actions in the areas affected by the projects" as the Court wrote in the Order denying Plaintiffs' motion for a preliminary injunction. Native Ecosystems Council v. Dombeck, 304 F.3d 886 (9th Cir. 2002). This argument is based on a mischaracterization of the Court's preliminary injunction Order. It is clear that the Court rejected the claim that "the Forest Service did not analyze cumulative effects on grizzlies as a result of the current motorized access conditions within the Flathead National Forest as a whole, together with additional impacts caused by the

[Robert Wedge] and [West Side] Projects salvage sales and their high level of motorized access." Doc. No. 86 at 10. The Court was mindful of the requirement that the Service consider the cumulative impacts of actions forest-wide when it assessed the sufficiency of the Service's analysis.

Those cumulative impacts are discussed throughout the administrative record at USFS RW AR T-1 at 3-4 to 3-16, 3-174 to 3-175, 3-180, 3-194 to 3-199, 3-201 to 3-209; USFS RW AR Rg-005 at 26-32; USFS WS AR T-1 at 3-35 to 3-41, 3-293 to 3-300, 3-310 to 3-311, 3-313 to 3-319; USFS WS AR J-92 at 29-34. Amendment 24 and its impacts on snowmobiling, though not explicitly discussed because the amendment was in consultation at the time with six potential alternatives, are analyzed to the extent possible at USFS RW AR T-1 at 3-8, 3-13 to 3-14, 3-201 to 3-202, 3-206; USFS RW AR Q-3; USFS WS AR T-1 at 1-38, 1-47, 3-37, 3-314, 3-318; USFS WS AR Rt-30. The Forest Service's analyses of these issues constitute the NEPA-mandated "hard look" at the effects of the action under the deferential standard of review of the APA and NEPA.

The Plaintiffs' final argument is that the Forest Service failed to include non-federal actions in state and private lands near the Robert-Wedge Project. The argument is contradicted by the record, which indicates that the Robert-Wedge environmental impact statement's cumulative effects analysis takes into account

non-federal actions in the form of private land development, state fire suppression, state and private timber harvest, state and private road activities, and aquatic recreation.  USFS RW AR T-1 at 3-9, 3-14.  The agency's analysis is not arbitrary and capricious or contrary to the procedures required by law.

The Defendants' motion for summary judgment is granted with regard to the Plaintiffs' NEPA claim.

## V.  Order

Based on the foregoing, IT IS HEREBY ORDERED that the Plaintiffs' motion to strike (Doc. No. 102) is GRANTED, the Federal Defendants' motion for summary judgment (Doc. No. 107) is GRANTED as to all claims, and the Plaintiffs' motion for summary judgment (Doc. No. 99) is DENIED as to all claims.

DATED this 31st day of March, 2008.

_____
DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT

-57-